UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| JOSEPH BISHOP, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:06-cv-1064-SEB-TAB |
| | ) | |
| CITY OF INDIANAPOLIS, STEVEN | ) | |
| ATZHORN, JESUS SORIA, AND | ) | |
| CHRISTA DOBBS, | ) | |
| Defendants. | ) | |

**ENTRY GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

This cause is currently before the Court on Defendants' Motion for Partial

Summary Judgment [Docket No. 28], filed on July 14, 2007.  Plaintiff, Joseph Bishop,

brought his complaint pursuant to 42 U.S.C. § 1983 and the Indiana Tort Claims Act, Ind.

Code § 34-13-3-1 *et seq*., against the City of Indianapolis ("City") and defendants Steven

Atzhorn, Jesus Soria, and Christa Dobbs in their individual capacities.  Mr. Bishop filed

this action after the individual defendants, all of whom are Indianapolis Police

Department ("IPD") officers, came to his home in response to a "check welfare" call

concerning his daughter, Sarah Bishop.  Mr. Bishop claims the officers violated his

Fourth Amendment rights and alleges the officers' conduct constituted unreasonable

search, unlawful detention, excessive force, and malicious prosecution pursuant to federal

law.  He further claims battery, false arrest, and unlawful search and seizure under

Indiana law.

Defendants claim that they are entitled to partial summary judgment on Mr. Bishop's unreasonable search, false arrest, malicious prosecution, and Indiana constitutional claims because: (1) exigent circumstances existed at the time of the officers' entry into Mr. Bishop's home; (2) the officers had probable cause to arrest Mr. Bishop for resisting law enforcement and battery; (3) Mr. Bishop's federal malicious prosecution claim is barred by the United States Constitution and pursuant to <u>Newsome v. McCabe</u>, 256 F.3d 747 (7th Cir. 2001); and (4) the Indiana Constitution provides no private right of action to Plaintiff.  Defendants further argue that Officers Atzhorn, Soria, and Dobbs are entitled to qualified immunity on Plaintiff's unreasonable search claim. Plaintiff responded to this motion on October 9, 2007, challenging Defendants' claim for partial summary judgment regarding entry, false arrest, and malicious prosecution, and moving for sanctions against Defendants.  Plaintiff also voluntarily dismissed the Indiana state constitutional claim.  Finally, for the first time and without formal motion, Plaintiff set forth in his response his own claims for summary judgment regarding the officers' entry and Mr. Bishop's arrest.  For the reasons detailed below, we <u>GRANT IN PART</u> and <u>DENY IN PART</u> Defendants' Motion for Partial Summary Judgment.

**<u>Factual Background</u>**

On November 13, 2004, three IPD officers were dispatched to Mr. Bishop's home to check on the welfare of his seventeen-year-old daughter, Sarah Bishop.  The officers were dispatched to the Bishop home after Sarah's friend, Amanda Ewing, told 911

2

dispatchers that Sarah had been beaten by her father.[1]  Defs.' Exh. A (Event History Detail) at 1.

There are significant factual disputes regarding the events that ensued when the officers arrived at the Bishop residence. Officer Dobbs was the first officer to arrive.  In Officer Dobbs's deposition, she asserts that she knocked on the front door and asked to speak with Mr. Bishop.  Defs.' Exh. B (Deposition of Christa Dobbs) at 13:1-10.  Officer Dobbs states that she asked Mr. Bishop whether she could enter his home to talk with him, and he did not answer.  Officer Dobbs repeated herself and told Mr. Bishop she was there because she received a dispatch regarding his address and wanted to come in and speak with him.  According to Officer Dobbs, Mr. Bishop was unresponsive.  Officer Dobbs states that she repeated that she needed to come in and talk with Mr. Bishop about why she was there.  Again, Officer Dobbs states that Mr. Bishop was unresponsive. When Mr. Bishop closed the front door, Officer Dobbs radioed for assistance from another officer.  Id. at 13-15.

Mr. Bishop challenges the nature of this initial encounter with Officer Dobbs as characterized by the defendants.  As a threshold matter, Mr. Bishop claims that he never

---

[1]     According to Mr. Bishop, his daughter suffers from an emotional disorder and self-mutilates. Pl.'s Resp. Defs.' Mot. Summ. J. at ¶ 2.  Mr. Bishop alleges that Sarah became upset when refused permission to attend a rock concert, and subsequently locked herself in her bedroom and cut her right forearm. This prompted an altercation between Mr. Bishop and Sarah.  Mr. Bishop alleges that neither he nor Sarah was aware that Ms. Ewing had called the police.

choked Sarah or intentionally hit her.[2]  Pl.'s Resp. at ¶ 14.  In his deposition, Mr. Bishop

testified that he saw Officer Dobbs arrive at his residence in her patrol vehicle, and

opened the door as she initially approached his home.  Pl's. Exh. 2 (Deposition of Joseph

Bishop) at 30-31.  His large pet rottweiler accompanied him.  Mr. Bishop claims that

Officer Dobbs's first words to him were: "Put the dog up. I'm coming in to talk to you."

Mr. Bishop then asked Officer Dobbs what she wanted, and, without responding directly

to his question, she again asked him to restrain the dog.  Mr. Bishop asserts that Officer

Dobbs then threatened to shoot the animal.  Id. at 31-32.  Specifically, Mr. Bishop

testified in his deposition that:

> Q:     And what was your reaction to that [Officer Dobbs' asking him to put the
>        dog up]?
> A:     I asked her what she was coming in to talk to me about.
> Q:     And then what happened?  What did she say?
> A:     She says, "You need to put the dog up.  I'm coming in to talk to you.  And
>        then I said, "Why can't you tell me why you're here, why you want to talk
>        to me?" And then she says, "I'll shoot the fucking dog."  And at that point, I
>        closed the door on her.

Pl.'s Exh. 2 (Deposition of Joseph Bishop) at 31-32. Mr. Bishop then called police

dispatch; he claims the dispatcher, not Officer Dobbs, told him that police were at his

home to check on Sarah's welfare.  Id. at 33.

---

[2]     Mr. Bishop stated that Sarah "may have been accidentally injured" when he tried
to drag her out of her bedroom to inspect the cuts on her arm.  Pl.'s Resp. at ¶ 12.
In her deposition, Sarah testified that her eye may have been injured when her
father attempted to lift her; she pulled away from Mr. Bishop, whose open hand
may have slipped and hit her near her eye.  Pl.'s Exh. 3 (Deposition of Sarah
Bishop) at 20.

4

Officer Dobbs disputes these facts.  She claims that after she knocked on Mr. Bishop's front door and he opened it, she introduced herself.  Defs.' Exh. B (Deposition of Christa Dobbs) at 13.  Mr. Bishop did not respond; according to Officer Dobbs, there was "little to no verbalization, maybe more along the lines of acknowledgment."  Id. Officer Dobbs then repeated herself, asked to come inside and speak with Mr. Bishop, and stated that she was at his house in response to a call.  Officer Dobbs states that she did not, at that time, reveal the nature of the call to Mr. Bishop.  Again, Mr. Bishop did not speak. Officer Dobbs repeated that she needed to come inside and speak with Mr. Bishop about the situation.  Id. at 12-14.  Officer Dobbs testified that "at one time" during this encounter Mr. Bishop stepped aside and "was going to allow his dog to come at" her. Officer Dobbs told Mr. Bishop she was not at his home to hurt his dog, and said "don't force me to, you know, protect myself and have to shoot your dog."  Id. at 15-16.

After this encounter, Mr. Bishop spoke with the dispatcher.  Following that conversation, he opened the front door to go outside and speak with Officer Dobbs.  Pl.'s Exh. 2 at 33-34.  By this time, Officer Jesus Soria had arrived on the scene and spoken to two of Sarah Bishop's friends regarding the incident.  Defs.' Exh. B at 18.   Officer Soria testified that he and Officer Dobbs then walked to the front door, where Officer Soria explained the nature of the call to Mr. Bishop.  Defs.' Exh. D (Deposition of Jesus Soria) at 16.  Officer Soria stated that Mr. Bishop refused to allow the officers to enter the house to check on Sarah.  Id.  Mr. Bishop testified that he then told Sarah to go outside to speak with the officers.  Pl.'s Exh. 2 at 38-39.  At this time, another officer, Kevin Larussa,

5

arrived on the scene.  Defs.' Exh. D at 19.

Outside the Bishop home, Officer Dobbs proceeded to ask Sarah questions about her welfare.  Officer Dobbs testified that Sarah did not answer when asked if she was all right.  Defs.' Exh. B at 28-29.  Sarah's hair hung in her face, her eyes cast downward, and Officer Dobbs could not tell whether she was physically injured.[3]  In her deposition, Sarah testified that she told Officer Dobbs nothing had happened.  Defs.' Exh. F (Deposition of Sarah Bishop) at 31-33.  She further stated that it was none of Officer Dobbs's business.  Id.  According to Mr. Bishop, Sarah was outside for about ten minutes.  Pl.'s Exh. 2 at 42.  Mr. Bishop told Sarah to come inside, and she complied.[4]  Id. at 41-42.  Based on her observations of Sarah and on her training and experience, Officer Dobbs felt further investigation was warranted.  Defs.' Exh. B at 30.

When Sarah re-entered the house, Mr. Bishop called police dispatch and asked for

---

[3]    In his deposition, Officer Soria stated that he saw what appeared to be a bruise on Sarah.  Defs.' Exh. D at 23.  Officer Larussa also testified that Sarah appeared to have a black eye, and he conveyed that information to his lieutenant via police radio.  Defs.' Exh. E (Deposition of Kevin Larussa) at 14.

[4]    Mr. Bishop asserts in his response that he could not hear Sarah's conversation with the officers, but did  hear Officer Larussa say, "No victim, no crime."  Pl.'s Resp. at ¶ 48; Pl.'s Exh. 2 at 41.  Officer Larussa stated that he does not recall making that statement.  Defs.' Exh. E at 17.  In his deposition, Mr. Bishop did not attribute that statement to any particular officer.  Pl.'s Exh. 2 at 41.  Officer Larussa then left the scene.  Id.  In his response, Mr. Bishop argues that if exigent circumstances existed warranting police entry into his home, Officer Larussa would not have left.  Pl.'s Resp. at ¶ 53.

a supervisor to report to his home.[5]  Pl.'s Exh. 2 at 44.  At or around the same time,

Officer Dobbs also radioed for a supervisor.  Defs.' Exh. B at 36.  Sgt. Steven Atzhorn

responded, and spoke with Officer Dobbs about both the nature of the check welfare call

and the officers' contact with Mr. Bishop and Sarah.[6]  Defs.' Exh. G (Deposition of

Steven Atzhorn) at 11-12.  Sgt. Atzhorn then approached Mr. Bishop's front door and

knocked.  Mr. Bishop opened the door, with his dog standing behind him, and Sgt.

Atzhorn could see Sarah sitting in the living room.  According to Sgt. Atzhorn, Sarah

appeared "broken."  Id. at 26.

The facts surrounding what happened next are even more hotly disputed by the

parties.  According to Sgt. Atzhorn, Mr. Bishop stood facing him in the front doorway

and raised his arm.  Sgt. Atzhorn stated that he believed Mr. Bishop was moving to close

the door.  Because Sgt. Atzhorn feared for Sarah's safety and believed she needed help,

he grabbed Mr. Bishop's left arm.  Mr. Bishop then used his right arm to brace himself

against the door frame, and Sgt. Atzhorn told him to stop resisting.  Sgt. Atzhorn then

attempted to pull Mr. Bishop out of the house; however, Mr. Bishop held fast to the door

jamb and elbowed Sgt. Atzhorn in the mouth.  Id. at 28-29.  A struggle ensued,

---

[5]       In his deposition, Mr. Bishop stated that he called IPD "because he felt Officer
Dobbs was very unprofessional and somebody needed to know."  Pl.'s Exh. 2 at
45.

[6]       Sgt. Atzhorn testified that he knew of the nature of the call before arriving at the
Bishops' home.  Defs.' Exh. G at 9.  He also knew that Officers Dobbs and Soria
had conducted an investigation and that Mr. Bishop had requested a supervisor.
Id. at 10-11.

culminating in Mr. Bishop's arrest for resisting law enforcement and battery on a police officer.

Mr. Bishop's version of these events differs significantly from Sgt. Atzhorn's. Mr. Bishop maintains that after he called police dispatch, he went inside his home to wait for the supervisor to arrive. Pl.'s Exh. 2 at 43. When Sgt. Atzhorn knocked, Mr. Bishop stated that he opened the door approximately six to eight inches. He peered out and saw Sgt. Atzhorn standing on the front porch landing, directly in front of the front door. When Sgt. Atzhorn said he was coming inside to talk, Mr. Bishop refused, saying he would come outside instead. Mr. Bishop testified that he started to come outside, but Sgt. Atzhorn placed two hands on his chest and shoved him forcibly back into the house. Mr. Bishop said he was not in the threshold of the door at that point, and grabbed the door frame in an attempt to "stand his ground." Mr. Bishop admits that he resisted Sgt. Atzhorn. Mr. Bishop stated that Sgt. Atzhorn was unable to push him back into the house, so he then tried to pull him out. During this time, Sgt. Atzhorn was still standing on the landing. Officer Soria, who was standing on the landing and front step, struck Mr. Bishop's wrists to loosen his grip on the door frame, and Officer Dobbs sprayed CS at Mr. Bishop while standing on the porch. Officer Soria broke Mr. Bishop's grip on the door, and Sgt. Atzhorn pushed him into the house and onto the floor on his hands and knees. A scuffle ensued, during which Mr. Bishop was shocked with a Taser, and Mr.

Bishop was arrested.[7]  Id. at 53-57.

Mr. Bishop asserts that, based solely on Sgt. Atzhorn's review of the initial run report and his conversation with Officer Dobbs at the scene, Sgt. Atzhorn did not have probable cause to arrest him; thus, according to Mr. Bishop, no exigent circumstances existed which warranted police entry.  Pl.'s Resp. at ¶¶ 67-68.

After Mr. Bishop's arrest, Sgt. Atzhorn submitted a probable cause affidavit to the Marion County Prosecutor.  Defs.' Redacted Exhibit H (Case Report); see also Pl.'s Exh. 7 (Deposition of Steven Atzhorn) at 39.  Mr. Bishop contends that Sgt. Atzhorn lied in his probable cause affidavit when he stated that Mr. Bishop had been the initial aggressor in the scuffle.  Pl.'s Resp. at ¶ 115.  Indeed, in his deposition, Sgt. Atzhorn did admit to lying in the probable cause affidavit about the circumstances giving rise to the arrest of Mr. Bishop, but maintains that he nonetheless had reasonable grounds to enter Mr. Bishop's house to protect Sarah.  Pl.'s Exh. 7 at 38. He also admitted that he contacted the Marion County Prosecutor to express his desire to have the case dismissed, and indicated that he wanted the criminal charges against Mr. Bishop to be dismissed before

---

[7]     In his response, Mr. Bishop asserts a range of additional facts pertaining to his excessive force claim, which are outside the scope of Defendants' motion.  The parties also dispute the facts relating to Mr. Bishop's compliance with the arrest. For example, Mr. Bishop claims Officer Dobbs kicked him in the groin and leg before pushing him face down on the ground.  Pl.'s Resp. at ¶¶ 89-90.  We decline to consider these disputed facts at this point in the litigation, as they relate an issue not raised in Defendant's motion.

he had to testify in a deposition for that proceeding.  <u>Id.</u> at 51.  Specifically, Sgt. Atzhorn

stated:

> Q:    Well, you lied about what happened in your Probable Cause Affidavit, did
>       you not?
> A:    Correct.
> Q:    Because you thought that you needed to put additional facts in there to
>       justify your entry into the house, and you used the physical force against
>       Mr. Bishop, didn't you?
> A:    Yes, I did lie in the Probable Cause Affidavit.

Pl.'s Exh. 7 at 32.  In response to further questioning, Sgt. Atzhorn stated:

> Q:    What was your motivation to lie like that?
> A.    I'm going to go back to my previous answer.  Just my emotional state at the
>       time, or the mistake that I had made, and just the feeling of failing Sarah,
>       that didn't just go away immediately.  As I admit, I made a bad mistake
>       about lying on the affidavit.  And it shows very early on in that course of
>       action.
> Q:    To lie?
> A:    To lie on the affidavit, yes.

<u>Id.</u>

This lawsuit was filed on July 13, 2006, by Mr. Bishop.

## <u>Legal Analysis</u>

### I.    <u>Standard of Review</u>

Summary judgment is appropriate when the record shows that there is "no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a matter

of law."  Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).

Disputes concerning material facts are genuine where the evidence is such that a

reasonable jury could return a verdict for the non-moving party.  <u>Anderson v. Liberty</u>

Lobby, Inc., 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party.  See id. at 255. However, neither the "mere existence of some alleged factual dispute between the parties," id., 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment.  Michas v. Health Cost Controls of Ill., Inc., 209 F.3d 687, 692 (7th Cir. 2000).

Summary judgment is not a substitute for a trial on the merits nor is it a vehicle for resolving factual disputes.  Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994).  Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate.  See Shields Enterprises, Inc. v. First Chicago Corp., 975 F.2d 1290, 1294 (7th Cir. 1992); Wolf v. City of Fitchburg, 870 F.2d 1327, 1330 (7th Cir. 1989).  But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated.  See Celotex, 477 U.S. at 322; Ziliak v. AstraZeneca LP, 324 F.3d 518, 520 (7th Cir. 2003).   A failure to prove one essential element "necessarily renders all other facts immaterial."  Celotex, 477 U.S. at 323.

The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of

11

evidence to support the non-moving party's case. <u>Celotex</u>, 477 U.S. at 325.  A plaintiff's self-serving statements, which are speculative or which lack a foundation of personal knowledge, and which are unsupported by specific concrete facts reflected in the record, cannot preclude summary judgment.  <u>Albiero v. City of Kankakee</u>, 246 F.3d 927, 933 (7th Cir. 2001); <u>Stagman v. Ryan</u>, 176 F.3d 986, 995 (7th Cir. 1999); <u>Slowiak v. Land O'Lakes, Inc.</u>, 987 F.2d 1293, 1295 (7th Cir. 1993).

## II.     Unreasonable Search

Mr. Bishop alleges that the individual defendants' conduct amounts to an unlawful search in violation of the Fourth Amendment to the United States Constitution.  The Fourth Amendment generally proscribes entry into a person's home without a warrant. <u>See</u> <u>Horton v. California</u>, 496 U.S. 128, 134, fn.4 (1990).  This well-established tenet of constitutional law holds that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions."  <u>Mincey v. Arizona</u>, 437 U.S. 385, 390 (1978) (citing <u>Katz v. United States</u>, 389 U.S. 347, 357 (footnotes omitted)); see also <u>South Dakota v. Opperman</u>, 428 U.S. 364, 381 (Powell, J., concurring).

One such exception is the existence of exigent circumstances, which – as both parties acknowledge in their respective briefs – may include "the risk of danger to police or to other persons inside or outside a dwelling." <u>Sheik-Abdi v. McClellan</u>, 37 F.3d 1240,

12

1244 n.3 (7th Cir. 1994) (quoting <u>Minnesota v. Olson</u>, 495 U.S. 91, 100 (1990)).

However, absent exigent circumstances, the "firm line at the entrance to the house . . .

may not reasonably be crossed without a warrant." <u>Payton v. New York</u>, 445 U.S. 573,

590 (1980).  In evaluating such claims, we consider the objective reasonableness of the

officer's belief that exigent circumstances existed.

      The Seventh Circuit distinguishes between the exigent circumstances doctrine and

the closely-related "emergency aid doctrine," which permits warrantless entry into a

dwelling when police officers "reasonably believe a person within is in need of

immediate aid." <u>Sheik-Abdi</u>, 37 F.3d at 1244 (quoting <u>Mincey v. Arizona</u>, 437 U.S. at

392).[8]  Pursuant to this doctrine, the officer bears the burden of proving he had an

objectively reasonable belief that his entry was made to "render assistance or prevent

harm." <u>Sheik-Abdi</u>, 37 F.3d at 1244 (citing <u>United States v. Moss</u>, 963 F.2d 673, 678

(4th Cir. 1992)).  The question, according to the law of this Circuit, is "whether [officers]

had the reasonable belief that there was a compelling need to act and no time to obtain a

warrant." <u>United States v. Foxworth</u>, 8 F.3d 540 (7th Cir. 1992) (quoting <u>Michigan v.

Tyler</u>, 436 U.S. 499 (1978)).  This focuses our inquiry squarely on the question of

---

[8]    We note that in <u>Sheik-Abdi</u>, the Seventh Circuit declined to pass on the question
of whether circumstances constituting "emergencies" are less circumscribed than
those leading to "exigent circumstances," because the plaintiff did not challenge
the lawfulness of the police officers' presence in his home.  <u>Sheik-Abdi</u>, 37 F.3d
at 1244.  Conversely, the presence of the IPD officers in Mr. Bishop's home in
this case forms the basis of Plaintiff's unreasonable search claim.

probable cause.

Defendants argue that exigent circumstances – namely, Sarah Bishop's safety – justified entry because the officers has a "reasonable and objective fear that Sarah was in immediate danger," given the nature of the check welfare call, which involved allegations of domestic violence.  Defs.' Reply at 9.  Moreover, Defendants claim they had a reasonably objective belief after speaking with and observing Sarah that she had been beaten, and they feared her father would reprise this behavior when they left. Plaintiff asserts that exigent circumstances did not justify the officers' entry because there was "time to get a warrant, but no need to do so."  Pl.'s Resp. at 17.  Plaintiff contends that the officers claimed only a need to speak with Mr. Bishop and Sarah, and Defendants do not dispute that Sarah did indeed come *outside* the house to speak with Officer Dobbs.[9]  Plaintiff further argues that the officers *knew* they did not have exigent circumstances "approaching the recognized standard" of "immediate jeopardy to life and limb" as observed by the Seventh Circuit in Brokaw v. Mercer County, 235 F.3d 1000, 1010-11 (7th Cir. 2000).[10]  Pl.'s Resp. at 24.  Plaintiff thus asserts that the officers lacked

[9]      However, as we have discussed, the facts are heavily disputed concerning any conversation between the officers and Mr. Bishop's, and regarding Sgt. Atzhorn's encounter with Mr. Bishop after Sarah had gone back inside.

[10]      Plaintiffs further note that this standard parallels IPD police regarding what exigencies warrant forced entry.  See Pl's. Resp. at 17; see also Pl.'s Exh. 8 (Copy of IPS Warrant Policy), which states that the category of "exigent circumstances" includes "factual situations in which the officer forcing entry to a dwelling has probable cause to believe immediate entry is necessary to prevent injury to a person in a dwelling."

14

a "reasonable basis for an immediate need to protect Sarah" after she returned inside the Bishop home, rendering their entry unreasonable.

Here, significant disputes of material fact exist regarding the exigency of the IPD officers' entry into Mr. Bishop's home, and preclude summary judgment as to the unreasonable search claim. Even if we assume, *arguendo*, that probable cause existed to warrant entry, it is unclear on the facts presented whether an exigency did, in fact, exist. The genuine factual disputes surrounding the officers' claims that immediate action was warranted, coupled with discrepancies regarding the officers' interactions with Mr. Bishop and the encounter between Mr. Bishop and Sgt. Atzhorn, create sufficient doubts to cause us to conclude that summary judgment is inappropriate at this time.

The parties also disagree significantly as to the facts surrounding the officers' conversation with Sarah Bishop. For example, it is unclear whether Mr. Bishop was close enough to his daughter to overhear (and thus exert influence over) her conversation with Officer Dobbs. The parties also dispute why Sarah was permitted to reenter the house after speaking with Officer Dobbs. The substance of this encounter may well have informed the officers' belief that they needed to enter the home. Moreover, the fact that Sarah was allowed to reenter the Bishop home casts doubt on whether the emergency aid doctrine cited by Defendants would apply here.

Defendants cite United States v. Arch, 7 F.3d 1300 (7th Cir. 1993) for the proposition that police may enter a home without a warrant if the facts "at the moment of entry would lead a reasonable, experienced law enforcement officer to believe that

15

someone inside the house . . . required immediate assistance." <u>Arch</u>, 7 F.3d at 1304.
However, in <u>Arch</u>, the Seventh Circuit noted that the suspect answered the door with a
knife in his hand.  The officers saw furniture upended behind the suspect, who also
resisted officers "violently."  <u>Id.</u>  Conversely, Defendants here have introduced no facts
into the record to indicate that Mr. Bishop appeared armed.  Rather, the officers relied
upon Officer Dobbs's conversation with Sarah Bishop, their general observations, and
Sgt. Atzhorn's encounter with Mr. Bishop in the door frame to inform the decision to
enter. It is questionable, based on the facts presented here, whether Mr. Bishop violently
resisted officers in their efforts to discuss the matter with him and his daughter; this
question is the sort that should be reserved for the finder of fact.  Simply, <u>Arch</u> is not
analogous.  It presents a far clearer case of exigency than Defendants would have us
believe existed here.

        To that end, the facts are clearly contested regarding whether the officers
reasonably believed the requisite "immediate threat of violence" existed to justify entry.
We particularly note the factual disputes involving the nature and substance of the
conversations between Mr. Bishop and Officers Dobbs and Soria.  Pursuant to the
officers' version of the facts, Mr. Bishop appeared uncooperative and even threatening.
Conversely, Mr. Bishop's version of the facts reflects the opposite.  For example, Officer
Dobbs disputes that she used profanity in her initial conversation with Mr. Bishop, and
Mr. Bishop claims she unleashed a profanity-laced tirade in threatening to shoot his pet
dog.  The parties also dispute other statements allegedly made by Officer Dobbs and Mr.

Bishop in that initial exchange.  Officer Dobbs claims that Mr. Bishop used his pet rottweiler to intimidate her, while Mr. Bishop claims just the opposite.  The parties further disagree as to whether Officer Larussa commented, "No victim, no crime," before he left the Bishop residence.

Factual disputes similarly exist regarding the encounter between Mr. Bishop and Sgt. Atzhorn.  For example, the parties disagree as to whether Mr. Bishop offered to come outside and speak with Sgt. Atzhorn when he arrived. Mr. Bishop contends that he attempted to shut the door on Sgt. Atzhorn, while Sgt. Atzhorn states that Mr. Bishop raised his arm, leading him to  believe that Mr. Bishop would strike him.  This encounter is exceedingly pertinent to an analysis of whether exigent circumstances existed *at the time of entry*, and given the material factual disputes surrounding it, summary judgment is not appropriate.[11]

We further note that several cases cited by Defendants in support of their legal argument are factually distinguishable from the instant case.  For example, Defendants cite the Supreme Court's decision in <u>Georgia v. Randolph</u>, 547 U.S. 103 (2006), for the proposition that officers may enter a home absent a warrant to protect a resident from domestic violence.  However, in truth, Randolph did not directly address that question.

---

[11]     Moreover, we note that Sgt. Atzhorn, in his deposition, acknowledged that when he walked to Mr. Bishop's front door, he did *not* believe exigent circumstances existed, a point Defendants now dispute in their brief.  Pl.'s Exh. 7 at 13.  While this statement, which involves a mixed question of law and fact, is not ultimately dispositive, it is indeed relevant to our analysis and appears fraught with disputed issues of fact.

Rather, as Plaintiff correctly points out, the issue in <u>Randolph</u> was whether an evidentiary seizure is lawful with permission of one occupant if the other occupant refuses consent. Pl's. Resp. at 20-21.  In *dicta*, the <u>Randolph</u> Court stated that:

> No question has been raised, or reasonably could be, about the authority of the police to enter a dwelling to protect a resident from domestic violence; so long as they have good reason to believe such a threat exists, it would be silly to suggest that the police would commit a tort by entering, say, to give a complaining tenant the opportunity to collect belongings and get out safely, or to determine whether violence (or threat of violence) has just occurred or is about to (or soon will) occur, however much a spouse or other co-tenant objected.

547 U.S. at 118.[12]  The Court further stated: "[T]he undoubted right of police to enter in order to protect a victim . . . has nothing to do with the question in this case."  <u>Id.</u> at 119. Thus, Defendants' reliance on <u>Randolph</u> is misplaced.

Defendants also attempt to rely on the Supreme Court's decision in <u>Brigham City v. Stuart</u>, 547 U.S. 398 (2006).  In <u>Stuart</u>, the Court held that the need to assist persons who are seriously injured or threatened with injury constitutes an exigency which obviates the warrant requirement of the Fourth Amendment.  However, <u>Stuart</u> also is factually distinguishable from the circumstances of this case.  In <u>Stuart</u>, police arrived at the defendant's home in response to a noise complaint and, while standing in the

---

[12]     Moreover, <u>Randolph</u> is factually distinguishable because it involved a domestic dispute call by the defendant's wife, who granted police consent to search their home.  In this case, Plaintiffs have presented testimony from both Sarah and Joseph Bishop indicating neither granted consent to police entry at any time.  To the contrary, Joseph Bishop stated in his deposition that he refused entry to Officer Dobbs, and subsequently denied entry to Sgt. Atzhorn as well. Pl.'s Exh. 2 at 31-32; 50.  The facts are disputed as to whether Sgt. Atzhorn was, indeed, verbally denied entry.

driveway, observed a fight in the kitchen of the home in which four adults were attempting to restrain a juvenile.  The juvenile broke free and struck one of the adults in the face, causing him to spit blood into a nearby sink.  The Court held that the officers had an objectively reasonable basis to believe that the injured adult may have needed assistance and that the violence might have escalated further absent police intervention.  Id. at 660.  In so holding, the Court noted that the officers' subjective motivation to enter was irrelevant.  Id. at 658.

In contrast, the officers here responded to the Bishop home upon mere *suspicion* that Sarah Bishop had been injured by her father.  They did not actually see Mr. Bishop strike his daughter, and admit they were able to speak with Sarah Bishop, who said her father did not hit her.  Defs.' Exh. F (Deposition of Sarah Bishop).  Rather, Officer Dobbs, after speaking with Sarah and observing Sarah's nonverbal cues, felt that the situation warranted further investigation.  Defs.' Exh. B (Deposition of Christa Dobbs).  Officer Dobbs then relayed this information to Sgt. Atzhorn upon his arrival.  Id.  It is unclear, based on the facts, whether "the circumstances, viewed *objectively*, justify [the] action."  Stuart, 547 U.S. at 658 (quoting Scott v. United States, 436 U.S. 128, 138 (1978) (emphasis in original) (internal citations omitted)).  As we have discussed, the standard that must be satisfied to demonstrate exigency is stringent.

For these reasons, we **<u>DENY</u>** that portion of Defendants' Motion for Partial Summary Judgment as to Plaintiff's unreasonable search claim.

### III.    Unlawful Detention

Plaintiff also asserts that Defendants unlawfully detained him when they arrested him following the scuffle and subsequently detained him at the Marion County Jail. Defendants claim they had probable cause to arrest Mr. Bishop because he "resisted the officers' legal efforts to enter his home to ensure Sarah's safety."  Defs.' Reply at 10. Defendants argue that Mr. Bishop was properly arrested, with probable cause, for resisting law enforcement.  Id., citing IND. CODE § 35-44-3-3.  In Indiana, a person commits that offense if he "knowingly or intentionally: . . . forcibly resists, obstructs, or interferes with a law enforcement officer . . . while the officer is lawfully engaged in the execution of the officer's duties."  IND. CODE § 35-44-3-3(1) - (2).  Defendants allege that Mr. Bishop violated this statute by interfering "when the officers were attempting to question Sarah."  Defs.' Reply at 10.  They also contend that Mr. Bishop "obstructed their investigation by ordering Sarah to return inside the house and attempting to close the door on Sgt. Atzhorn."  Id.  Finally, Defendants maintain that Mr. Bishop obstructed their efforts to "go inside the house to check Sarah's welfare."  Id. at 10-11.

Defendants further contend that they could have arrested Mr. Bishop for battery on a police officer, battery on Sarah Bishop, or refusal to aid an officer.  Battery involves the knowing or intentional touching of another person in a "rude, insolent, or angry manner." IND. CODE § 35-42-2-1.   Defendants claim that they had probable cause to arrest Mr. Bishop because he "elbowed Sgt. Atzhorn in the mouth, causing him pain."  Defs.' Reply at 11.  Furthermore, Defendants claim that probable cause existed to arrest Mr. Bishop for

battery on his daughter.  Defendants note that the initial 911 call reported that Mr. Bishop

had beaten Sarah, and allege that when they arrived on scene, Mr. Bishop was "very

hostile and uncooperative" and "obstructed the officers' conversation with Sarah."  Id.

Defendants state that they observed Sarah with a black eye, and, though she said nothing

had happened, the officers felt further investigation was warranted.  Id. at 11-12.[13]

 Plaintiff argues that, at the time Sgt. Atzhorn crossed the threshold into the Bishop

home, the officers lacked probable cause to arrest for any offense.  Pl.'s Resp. at 26.

Plaintiff alleges that "[t]he officers at the scene admit that prior to crossing the threshold

of Mr. Bishop's door, they did not have probable cause to arrest Mr. Bishop for

anything."  Id.  Plaintiff then challenges each specific ground for arrest offered by

Defendants.[14]

 It is well-established that a police officer shall not arrest a person on less than

probable cause.  Gerstein v. Pugh, 420 U.S. 103 (1975); Beck v. Ohio, 379 U.S. 89, 81

(1964).  Unless exigent circumstances exist, an arrest warrant is required for an arrest in

the home.  Payton v. New York, 445 U.S. 572 (1980); see also Kirk v. Louisiana, 536

---

[13]    Defendants also claim they could have arrested Mr. Bishop for refusal to aid an officer in violation of IND. CODE § 35-44-3-7.  However, Defendants offer no evidence to substantiate this claim.  Accordingly, we do not consider it.

[14]    As to the claim regarding resisting law enforcement, Mr. Bishop states that, after entering his home, the officers were "not lawfully engaged in the execution of their duties."  Pl.'s Resp. at 27.  Next, Mr. Bishop states that whatever touching resulted from the scuffle between him and Sgt. Atzhorn was justified by Sgt. Atzhorn's unreasonable use of force in effecting an arrest without probable cause. Id. at 28.  Finally, Mr. Bishop says that the battery allegation regarding Sarah Bishop "conflicts with undisputed facts" in the record.  Id. at 29.

U.S. 635 (2002) (per curiam).

It is true that the existence of probable cause to arrest is an absolute bar to § 1983 claims for unlawful arrest.  Schertz v. Waupaca County, 875 F.2d 578, 582 (7th Cir. 1989), citing Mark v. Furay, 769 F.2d 1266, 1269 (7th Cir. 1985).[15]  It is also true that in a case such like this, in which an unlawful arrest claim is brought pursuant to § 1983 and a qualified immunity defense has been raised (which we shall discuss later), a reviewing court must determine whether the officer "actually had probable cause or, if there was no probable cause, whether a reasonable officer could have mistakenly believed that probable cause existed."  Wollin v. Gondert, 192 F.3d 616, 622-623 (7th Cir. 1999), citing Humphrey v. Staszak, 148 U.S. 719, 725 (7th Cir. 1998) (internal citations omitted).  This is referred to as "arguable" probable cause, and it exists when "a reasonable police officer in the same circumstances and with the same knowledge . . . could have reasonably believed that probable cause existed in light of well-established law." Humphrey, 148 U.S. at 725 (internal citations omitted).  Under the "flexible, commonsense approach" employed by this Circuit, an officer's belief does not have to be correct "or even more likely true than false."  Rather, it must simply be reasonable.

---

[15]    We note that the Seventh Circuit in Schertz further stated that "if the finding of probable cause is based on the defendant's intentional misrepresentation or concealment of material facts, the plaintiff may be able to proceed on a Fourth Amendment claim challenging the reasonableness of an arrest."  Schertz, 875 F.2d at 582.  This certainly weakens Defendants' argument, as Sgt. Atzhorn admits that he lied in the Probable Cause Affidavit, which formed the basis of the charges against Mr. Bishop.  See Pl.'s Exh. 7 (Deposition of Steven Atzhorn) at 32.

Wollin, 192 F.3d at 623; see also Texas v. Brown, 460 U.S. 730, 742 (1983).

We shall now turn to consider each of the Defendants' arguments regarding grounds for arrest in turn.

### 1.      Resisting Law Enforcement

As we previously noted in Section II, infra, the parties dispute the facts surrounding the encounter between Sgt. Atzhorn and Mr. Bishop at the threshold to the Bishop home.  Sgt. Atzhorn states that he believed Mr. Bishop raised his arm to close the door.  Sgt. Atzhorn testified that while Mr. Bishop "has a right to close his door," he grabbed Mr. Bishop because he saw Sarah sitting inside the house, looking "broken," and felt that she needed his help.  Defs.' Exh. G (Deposition of Steven Atzhorn) at 25-29.

We also note that Sgt. Atzhorn admits to lying in his probable cause affidavit, and states that he "needed a little more" basis to justify entering Mr. Bishop's home.  Pl.'s Exh. 7 at 32, 38-39.  Sgt. Atzhorn later testified that he initiated the physical contact with Mr. Bishop, and later lied to the prosecutor about what happened.  Id. at 42-43.  He further states that he felt he "could have resolved it [the situation] without Mr. Bishop having to go to jail that night."  Id. at 43.

Plaintiff urges us to consider these statements as admissions that, prior to entering Mr. Bishop's home, the officers lacked probable cause to arrest. When a party admits a fact adverse to his claim or defense while testifying in a deposition, the Seventh Circuit holds that "it is generally preferable to treat that testimony as solely an evidentiary

admission." Keller v. United States, 58 F.3d 1194, 1199 n.8 (7th Cir. 1995), citing

FEDERAL PRACTICE AND PROCEDURE § 6726 at 536-37.  The impropriety of Sgt.

Atzhorn's conduct notwithstanding, we note that this admission is particularly detrimental

to Defendants' argument regarding Mr. Bishop's unlawful detention claim.  While Sgt.

Atzhorn's statements do not qualify as legal conclusions, as Defendants point out, they

guide us in our analysis.  We find that a reasonable fact-finder could find in Mr. Bishop's

favor and determine that probable cause did not exist to arrest him for resisting law

enforcement on November 13, 2004.

We also take note of Plaintiff's reliance on the decision of the Indiana Court of

Appeals in Casselman v. State, 472 N.E.2d 1310 (Ind.Ct.App. 1985).  That court found

that where an arrest is not peaceful, "a large part of the justification for requiring the

arrestee's submission is lost.  In the absence of a criminal arrest warrant, an arrest cannot

be considered peaceful when it is accomplished by forcibly preventing a person from

closing the door to his house or by entering the house without permission."

Casselman, 472 N.E.2d at 1317.  Cf. IND. CODE. § 35-33-2-3 (authorizing forcible entry

to effect service of an arrest warrant).  The court further noted as *dicta* a previous

decision recognizing "that a citizen might rightfully resist the use of excessive force by

one attempting to make an arrest.  We think this exception exists and that it applies . . .

where the arrested is attempted by means of a forceful and unlawful entry into a citizen's

home."  Id. at 1316, citing City of Indianapolis v. Ervin, 405 N.E.2d 55, 63 (Ind.Ct.App.

1980).

Though <u>Casselman</u> pertained to a police officer's attempt to execute a civil process through a writ of body attachment,[16] its logic is nonetheless illuminating.  We have already concluded that it is debatable that an exigency existed to allow the officers to enter in the first place.  <u>See</u> Section II, <u>infra</u>.  The parties agree that Mr. Bishop allowed his daughter to come outside and speak with the officers, and that Sarah Bishop was permitted to re-enter the house at the end of that conversation.  If neither probable cause to arrest nor exigent circumstances existed, it would be reasonable to conclude that Mr. Bishop could shut his door to keep the police out.  This conclusion becomes a troublesome hurdle for Defendants to overcome.  We believe that a reasonable jury could, based on these facts, find in Mr. Bishop's favor.  <u>See</u> <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 248 (1986).

### 2.    Battery on a Police Officer

Defendants argue that they could have arrested Mr. Bishop for battering a police officer because he elbowed Sgt. Atzhorn in the mouth.  Defs.' Reply at 11.  Mr. Bishop does not dispute that his elbow struck Sgt. Atzhorn.  However, we decline to grant summary judgment for Defendants on this theory.  The struggle between Sgt. Atzhorn and Mr. Bishop ensued *after* Sgt. Atzhorn entered Mr. Bishop's home.  <u>Compare</u> <u>Casselman</u>, 472 N.E.2d at 1314. We have already concluded that genuine issues of

---

[16]    The writ of body attachment is not an arrest warrant, as the Court of Appeals has correctly noted.  <u>Casselman</u>, 472 N.E.2d at 1313.

material fact exist as to whether that entry was warranted.  Arguably, if Sgt. Atzhorn's had not entered the home, the physical contact between him and Mr. Bishop might not have occurred.

### 3.    Battery on Sarah Bishop

Defendants also argue that Mr. Bishop could have been arrested for battering Sarah Bishop.  For reasons similar to those articulated in Section III.1, infra, we decline to grant summary judgment on this theory, as well.  The facts are disputed as to whether Mr. Bishop actually committed this offense, and, moreover, the officers' actions in allowing Sarah to return to the house after questioning belie their contention that immediate action – that is, arresting Mr. Bishop – was warranted.

Having considered each of Defendants' proffered justifications for the warrantless arrest of Mr. Bishop, we find that a substantial question of material fact exists as to whether probable cause existed to arrest Mr. Bishop.  Where a probable cause question arises in a civil suit for damages, such as this case, it is "normally a jury question unless reasonable minds could not differ."  Maxwell v. City of Indianapolis, 998 F.2d 421 (7th Cir. 1993).  Because the facts surrounding the initial entry and subsequent arrest are so substantially disputed, we conclude that "reasonable minds" could, in fact, disagree as to whether Sgt. Atzhorn, Officer Dobbs, and Officer Soria possessed the necessary probable cause to arrest Mr. Bishop.  Accordingly, this question must be left to a jury to decide.

For these reasons, we **DENY** that portion of Defendants' Motion for Partial Summary Judgment pertaining to Plaintiff's unlawful detention claim.

## IV.   Malicious Prosecution

Plaintiff asserts a federal claim of malicious prosecution against *only* Sgt. Atzhorn. Pl.'s Resp. at 29.  Plaintiff contends that Sgt. Atzhorn "was the one who made the decision to enter Mr. Bishop's home, use force against him, [and] lie in his report and probable cause affidavit . . ."  Id.  Plaintiff also notes that Sgt. Atzhorn was expected to be the "chief complaining witness" against Mr. Bishop before the criminal charges against him were dropped in 2005, "after seven months of his being prosecuted."  Id. at 29-30.

While Defendants argue that Mr. Bishop's claim of malicious prosecution is barred by federal law, Plaintiff asserts that his claim is cognizable pursuant to 42 U.S.C. § 1983 and that a "reasonable jury could determine that Sgt. Atzhorn committed the constitutional tort of malicious prosecution."  Pl.'s Resp. at 36.

As a matter of law, Plaintiff cannot prevail on his claim for malicious prosecution. The Seventh Circuit has held that such a claim cannot stand where state law provides a remedy.  Newsome v. McCabe, 256 F.3d 747 (7th Cir. 2001).[17]  Notably, the plaintiff in

---

[17]      In Newsome, the petitioner served 15 years in prison for murder.  He was convicted of the killing in 1980, but an Illinois state court vacated his conviction in 1994.  In 1995, Mr. Newsome received a pardon from the Governor of Illinois, and he subsequently sued the Chicago Police Department pursuant to 42 U.S.C. § 1983, alleging that two police officers were "complicit in a wrongful prosecution" because they failed to tell prosecutors that Mr. Newsome's fingerprints did not match those at the scene of the crime, and because they coached two witnesses to

27

Newsome had served a 15-year murder sentence, and any claims for wrongful arrest and detention had accrued by the time he was pardoned.   Mr. Newsome thus predicated his complaint on the torts of wrongful conviction and imprisonment.

Writing for the court, Judge Easterbrook stated that the "first question on the table is whether Newsome has made out a violation of constitutional rights – for we cannot call a constitutional right 'clearly established' when the defendants acted . . . if it has never been established at all."  Newsome, 256 F.3d at 749-50.  The court pointed out that the Illinois State's Attorney's Office – not the police officers – initiated the criminal prosecution against Mr. Newsome, and stated that this opened a "complex debate about the extent to which, under Illinois law, a complaining witness can be deemed a party for purposes of the tort of malicious prosecution."  Id. at 750.  The court quickly dismissed this point, however, noting that "the answer doesn't matter unless there is a constitutional tort called 'malicious prosecution,' a subject not fully resolved" in Albright v. Oliver, 510 U.S. 266 (1994).  Id.

Albright confronted the issue of whether the Constitution allows for prosecution without probable cause.  Seven Justices answered that it did not, though they were divided as to why.  The Newsome court correctly pointed out that the reasoning of Justices Kennedy and Thomas constitutes the effective holding of Albright: where a person seized by the state did not have an adequate opportunity to defend himself in a criminal prosecution or an "adequate opportunity to obtain compensation in state court,"

---

pick Mr. Newsome from a lineup.  Newsome, 256 F.3d at 748-49.

the federal Constitution "still does not supply a damages remedy, unless the state courts

refuse to do so."  Albright, 256 F.3d at 750.  Thus, as the Newsome court stated,

> [S]atisfying the elements of the state-law tort of malicious prosecution, far
> from being the foundation of a constitutional tort, knocks out any
> constitutional tort of malicious prosecution, because, when a state-law
> remedy exists . . . due process of law is afforded by the opportunity to pursue
> a claim in state court.

Id. at 751.

In other words, because a state-law remedy was available to Mr. Newsome, his

federal malicious prosecution claim was doomed to fail.  The Newsome court held that

"claims of malicious prosecution should be analyzed . . . under the language of the

Constitution itself . . . if a plaintiff can establish a violation of the fourth (or any other)

amendment there is nothing but confusion to be gained by calling the legal theory

'malicious prosecution.'"[18] Id. (emphasis and citations omitted).

In his response, Plaintiff alleges that the reasoning of Newsome is faulty and based

on an incorrect interpretation of Albright.[19]  Plaintiff also states that Newsome is

---

[18]    The Seventh Circuit reaffirmed Newsome in Penn v. Harris, 296 F.3d 573, 576
(7th Cir. 2002) ("A plaintiff may not state a § 1983 claim simply by alleging that
he was maliciously prosecuted.  Instead, he must allege the violation of one of
his constitutional rights, such as the right to a fair trial . . . Although
Newsome precludes a malicious prosecution claim brought under § 1983, a state-
law claim of malicious prosecution is still viable"), and later in McCullah v.
Gadart, 344 F.3d 655, 658-59 (7th Cir. 2003) ("In short, we found [in Newsome]
that the existence of a state-law tort remedy 'knocks out' any constitutional tort
under due process for the same conduct . . . [Nevertheless,] it is possible to state a
§ 1983 claim that relies on the Fourth Amendment.")

[19]    Plaintiff also cites language from Albright which states: "[M]ost of the lower
courts recognize some form of malicious prosecution action under § 1983."
Albright, 510 U.S. at 271.  We also note that Plaintiff attempts to formulate a test

"inconsistent with . . . the law of other circuits."  Pl.'s Resp. at 30. While other circuits

may indeed recognize some type of malicious prosecution claim, as our discussion of

Newsome indicates, the Seventh Circuit's analysis is controlling.  Moreover, Indiana law

clearly provides a cause of action for malicious prosecution.  The Indiana Supreme Court

recognizes that claims for malicious prosecution "rests on the notion that the plaintiff . . .

has been improperly subjected to legal process."  City of New Haven v. Reichhart, 748

N.E.2d 374 (Ind. 2001).  The plaintiff bears the burden of proving four elements: (1) that

the defendant commenced, or caused to be commenced, an action against the plaintiff; (2)

that, in acting, the defendant behaved maliciously; (3) that the defendant instituted the

action without probable cause; and (4) that the original action ended in the plaintiff's

favor.  Id.; see also Crosson v. Berry, 829 N.E.2d 184, 195 (Ind.Ct.App. 2005).

     However, we need not determine whether Plaintiff has met this burden.  In his

Response, Plaintiff voluntarily dismissed all Indiana constitutional claims.  Moreover, he

---

that misconstrues the law in this Circuit pursuant to "Judge Posner's post-
Newsome decision in Gauger v. Hendle, 342 F.3d 354, 358 (7th Cir. 2003),"
which has been overruled.  In Gauger, the Seventh Circuit noted that
"all we held [in Newsome] is that there is no constitutional tort of
malicious prosecution as such."  The court went on to state: "[W]hen a
defendant is arrested and jailed on the basis of probable cause to believe
that he has committed a crime, and only later does police fraud enter the
picture . . . there is a question not as yet authoritatively resolved whether
the Fourth Amendment has been violated."  342 F. 3d at 359.  Finally,
"a false arrest is an unreasonable seizure . . . actionable under 42 U.S.C. § 1983."
     Id.  Thus, the Fourth Amendment right at stake can be vindicated by
properly alleging a false arrest claim at federal law, which Mr. Bishop has already
done.

has advanced viable Fourth Amendment arguments pertaining to the IPD officers' entry into his home and his subsequent arrest.   We again note the language of the Seventh Circuit in <u>Newsome</u>: "If a plaintiff can establish a violation of the fourth (or any other) amendment there is nothing but confusion to be gained by calling the legal theory 'malicious prosecution.'" <u>Newsome</u>, 356 F.3d at 751.

Before concluding, however, we note Plaintiff's argument that Indiana law does not permit claims for malicious prosecution against police officers.  Pl.'s Resp. at 30, fn.3, citing <u>Livingston v. Consolidated City of Indianapolis</u>, 398 N.E.2d 1302 (Ind.Ct.App. 1972).  This is of no consequence, for other options were available to Mr. Bishop to pursue this claim and, thus, recover damages if a court found in his favor. Specifically, Mr. Bishop could have couched this claim as one of false arrest at state law. <u>See</u> <u>Row v. Holt</u>, 2007 Ind. LEXIS 254 (Ind. 2007) (holding that "an arrest by a law enforcement officer without probable cause can give rise to civil liability for false arrrest under Indiana common law").  He did not.  Furthermore, the law of this Circuit also allows an unlawful arrest claim pursuant to 42 U.S.C. § 1983.  <u>See</u> <u>Wallace v. City of Chicago</u>, 440 F.3d 421, 427 (7th Cir. 2006) (noting that such a claim accrues on the day of arrest).  We note that Mr. Bishop appears to have exercised this option by suing for "unlawful detention."  Thus, any claim for malicious prosecution is not only barred, it is superfluous.

For the reasons stated above, we **<u>GRANT</u>** that portion of Defendants' Motion for

Partial Summary Judgment that pertains to Mr. Bishop's federal malicious prosecution claim.

## V.     Qualified Immunity Pertaining to Unreasonable Search

Qualified immunity is a privilege providing "an *immunity from suit* rather than a mere defense to liability." Saucier v. Katz, 533 U.S. 194, 200-01 (2001) (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) (internal quotations omitted)).  It is intended to insulate government agents "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

Analysis of qualified immunity claims involves a two-step inquiry.  First, considering the facts in the light most favorable to Mr. Bishop, we must determine whether the IPD officers clearly violated a constitutional right.  Second, we must decide whether that right was clearly established in the specific context of this case.  Saucier, 533 U.S. at 201.  We may not consider the second question until we are satisfied that Mr. Bishop has, or will have, alleged sufficient evidence to satisfy a factfinder that his Fourth Amendment rights have been violated.  Id.

As to this issue, the Seventh Circuit reviews whether the officer actually had probable cause.  If, on review, the court finds there was no probable cause, it inquires whether a reasonable officer could have mistakenly believed probable cause existed.  See Edwards v. Cabrera, 58 F.3d 290, 293 (7th Cir. 1995).   This comports with the Supreme

32

Court's holding in <u>Malley v. Briggs</u>, 475 U.S. 335 (1986), that police officers are not entitled to qualified immunity where they reasonably should have known they lacked probable cause to request the warrant.  We note that Plaintiff has failed in his Response and Sur-reply briefs to state the legal standard governing qualified immunity claims, and we urge Plaintiff in the future to more adequately explicate why he opposes specific legal arguments.  That oversight notwithstanding, we reiterate the reasoning we articulated in Sections II and III, <u>infra</u>, and find that serious issues of disputed fact remain about whether the IPD officers had probable cause to enter Mr. Bishop's home and seize his person.  Specifically, Sgt. Atzhorn has *admitted* to lying in his probable cause affidavit, the document which directly led to criminal charges against Mr. Bishop and the subsequent prosecution of those charges for seven months following his arrest.  This cautions strongly against granting summary judgment as to Defendants' qualified immunity claim, which necessarily depends on an affirmative showing of probable cause or a reasonable (though mistaken) belief therein.

For these reasons, we **<u>DENY</u>** that portion of Defendants' Motion for Partial Summary Judgment pertaining to a defense of qualified immunity.

## VI.  Conclusion

Before concluding, we note that Plaintiff failed to meet the Court's deadline of July 13, 2007, to file an independent motion for summary judgment in this matter. Instead, on October 9, 2007, Plaintiff attempted to "back-door" an argument in his

33

response brief that he is entitled to summary judgment.  Granting summary judgment in the Plaintiff's favor under these circumstances would be improper.  He has failed to timely file his own motion, even after requesting (and being granted) an extension of time to do so.  Therefore, we reject his argument that summary judgment is appropriate in his favor. We make clear that in denying summary judgment to Defendants on the unreasonable search, unlawful detention, and qualified immunity claims, we are not granting summary judgment in Plaintiff's favor on those counts.[20]

We further note that Plaintiff, in his Response, argues against a grant of summary judgment for the Defendants concerning his common law claims of battery, false arrest, trespass, and excessive force.  Pl.'s Resp. at 33.  Defendants did not move for summary judgment on those counts.  Accordingly, we do not consider those claims, or the relevant portion of Plaintiff's Response.  Those portions of Plaintiff's Complaint remain unaffected by this ruling.

In conclusion, we **<u>GRANT</u>** that portion of Defendants' motion which pertains to Plaintiff's malicious prosecution claim.  We **<u>DENY</u>** the portions of Defendants' motion pertaining to unreasonable search, unlawful detention, and qualified immunity.

IT IS SO ORDERED.

---

[20]    We also decline to consider Plaintiff's wholly undeveloped argument that Defendants should be sanctioned for "failing to apprize [sic] the Court of material facts and defendants' relevant admissions."  Pl.'s Resp. at 35.

Date:  03/24/2008

Copies to:

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

David Robert Brimm
WAPLES & HANGER
dbrimm@wapleshanger.com

Eleanor Kristyne Finnell
OFFICE OF CORPORATION COUNSEL
efinnell@indygov.org

Jaunae M. Hanger
WAPLES & HANGER
hangerj@iquest.net

John F. Kautzman
RUCKELSHAUS ROLAND KAUTZMAN BLACKWELL & HASBROOK
jfk@rucklaw.com

Jonathan Lamont Mayes
CITY OF INDIANAPOLIS, OFFICE OF CORPORATION COUNSEL
jmayes@indygov.org

John C. Ruckelshaus
RUCKELSHAUS ROLAND KAUTZMAN BLACKWELL & HASBROOK
jcr@rucklaw.com

Richard A. Waples
WAPLES & HANGER
richwaples@aol.com

35